Below is an opinion of the court.

_____
DAVID W. HERCHER
U.S. Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| In re<br><br>**James Patrick Birchfield** and **Melanie Ranee Birchfield**,<br><br>Debtors. | Case No. 21-31523-dwh7 |
| **Kelly A. Nickerson,**<br><br>Plaintiff,<br><br>v.<br><br>**James Patrick Birchfield** and **Melanie Ranee Birchfield**,<br><br>Defendants. | Adversary Proceeding No. 21-03047-dwh<br><br>MEMORANDUM DECISION AFTER TRIAL |

Page 1 – MEMORANDUM DECISION AFTER TRIAL

I.   Introduction[1]

In this action, Kelly Nickerson seeks a determination that a judgment debt owed to her by the chapter 7 debtors, Melanie Birchfield and James Birchfield, is nondischargeable under 11 U.S.C. § 523(a)(2)(A), (4), and (6). Because the Birchfields share a last name, I will refer to them by their first names.

The judgment is nondischargeable under 523(a)(4) and (6) as to Melanie to the extent it derives from her failure to pay Nickerson $3,929.62. But the balance of the judgment as to Melanie, and the entire amount as to James, is dischargeable.

II.  Facts

Nickerson's mother had an account at J.P. Morgan that she arranged to be transferred to Nickerson automatically on the mother's death. The mother also appointed Nickerson as the mother's attorney in fact.

The mother died in the fall of 2019. The balance of the J.P. Morgan account was then approximately $45,987.62. Nickerson was facing severed financial difficulties. She was in default on student loans and tax payments and had consulted a bankruptcy lawyer.

Nickerson and Melanie had been life-long friends. The same day that the mother died, Nickerson and Melanie visited a J.P. Morgan branch to arrange

---

[1] This disposition is specific to this action. It may be cited for whatever persuasive value it may have.

Page 2 – MEMORANDUM DECISION AFTER TRIAL

for withdrawal of the funds. Nickerson did not have a bank account into which the funds could be directly transferred, and she believed that she could not open a new account because she had exceeded her overdraft limits at her bank. She had tried to open an account at a different bank, but she was not allowed to do so due to her credit. She thought that her only choice was to have J.P. Morgan issue a check. She didn't want a check to be mailed to her residence, because she shared it with others and planned to be away from home when the check was expected to be mailed in December 2019, and she was concerned about the security of the check if mailed to her when she was not at home.

Nickerson used her power of attorney from her mother to change the account beneficiary from Nickerson to Melanie and arranged for J.P. Morgan to liquidate the account and mail the proceeds to Melanie. Melanie agreed to Nickerson's request that Melanie hold the funds for Nickerson and return them upon request. Nickerson claimed that Melanie agreed to hold the funds in check form—without depositing the check—and not deposit it anywhere.

According to Melanie, Nickerson arranged to have the funds sent to Melanie because Nickerson was concerned about Nickerson's creditors getting the money.

When James learned that Melanie would be receiving the funds as account beneficiary and would be returning the funds to Nickerson, he was upset and concerned about tax consequences, either from receiving the funds

or because Melanie is self-employed, and having such a large sum deposited in their account could lead to an audit. Several weeks after the mother died, the Birchfields visited Nickerson and told her that they were going to keep $15,000 of the funds in case they were audited by the IRS. Nickerson told them that there would be no tax consequences, but the Birchfields insisted on retaining the funds.

Two months later, J.P. Morgan paid Melanie the bulk of the account balance in two checks totaling $45,988.39. Melanie deposited the checks into an account that she held jointly with James at a credit union. J.P. Morgan later issued Melanie a third check for $4.66, but she never cashed it. Melanie testified that, when she originally put the funds in her account, she didn't intend to keep any of it.

About a week after Melanie received the second check, Nickerson and the Birchfields met at the Birchfields' credit union. There, they agreed that the Birchfields would pay Nickerson $30,000 on December 27, 2019, and the balance of $15,988.36 on January 2, 2020. Melanie signed an affidavit confirming the payment agreement. In the affidavit, Melanie also acknowledged that the J.P. Morgan account was temporarily placed "into Melanie's trust" until Nickerson "had a bank account in place to transfer the funds." The affidavit also refers to the Birchfields' agreed payment to Nickerson as a gift, but that's inconsistent with the affidavit's statement and

the parties' oral testimony that Nickerson gave the funds to Melanie in trust. The affidavit names Melanie "Melanie Espeland," her maiden name.

At some point, the Birchfields obtained advice from a tax preparer and a lawyer. The tax preparer advised them to hold 20 percent of the funds until the beginning of February 2020 to see if they received any 1099s. The lawyer advised that, because Melanie had become the account beneficiary, the funds were legally hers.

Melanie made payments to Nickerson of $30,000 and $6,058. After the second payment, the balance due to Nickerson was $9,930.36 ($45,988.36 less $36,058).

On January 22, 2020, a judgment creditor of the Birchfields garnished their credit-union account. The garnishee response stated that the account held $6,000 in garnishable funds. The garnishment occurred 20 days after the Birchfields had agreed to have completed payments to Nickerson.

About a year later, in early 2020, Nickerson sued both the Birchfields in state small-claims court to recover the unpaid funds. Nickerson obtained judgment on June 3, 2020. The judgment was for $9,929.62 as damages, $147 as costs and service expenses, and $135 as a prevailing-party fee, for a total of $10,211.62, with interest from June 3, 2020, at 9 percent per year. Because the damages portion of the judgment, $9,929.62, is less than the $9,930.36 amount that I previously calculated as unpaid, I will treat the lesser amount as the actual amount of trust funds that Melanie failed to pay Nickerson.

Page 5 – MEMORANDUM DECISION AFTER TRIAL

On September 10, 2020, Nickerson recovered $400.12 of the judgment debt by garnishment. On that date, interest had accrued on the judgment of $243.57 ($10,211.62 x .09 (9%) / 366 (number of days in 2020) x 97 (number of days from June 3 to September 10)). The $400.12 payment that day paid postjudgment interest of $243.57, and the balance of $156.55 reduced the judgment balance to $10,055.07.

## III. Discussion

### A. 523(a)(2)(A): false representation

523(a)(2)(A) makes a debt nondischargeable if it is for "false pretenses, false representation, or actual fraud." Nickerson's theory is that the Birchfields falsely represented that they would hold the money in safekeeping for her.

I disagree. A representation about the speaker's future conduct can support a 523(a)(2)(A) claim only if, when the statement was made, the speaker either intended not to perform or knew that the speaker would be unable to do so. Absent that intent or knowledge, to label as false a representation about the speaker's future conduct is—at best—only to say that the speaker made a promise and later failed to follow through.

I heard no evidence that Melanie, having represented that she would pay the funds to Kelly, either intended not to do so or knew that she would be unable to do so. I also heard no evidence of any representation by James to Nickerson before Nickerson arranged for Melanie to receive the funds.

Page 6 – MEMORANDUM DECISION AFTER TRIAL

Case 21-03047-dwh    Doc 63    Filed 08/11/22

Nickerson's arrangement to transfer the funds to Melanie was not induced by any false pretenses, false representation, or actual fraud by either of the Birchfields. The judgment is not nondischargeable under 523(a)(2)(A).

### B. *523(a)(4): defalcation while acting in a fiduciary capacity*

A debt is nondischargeable under 523(a)(4) if it is for "fraud, defalcation while acting in a fiduciary capacity, embezzlement, or larceny." Nickerson argues for nondischargeability only under the defalcation portion of 523(a)(4).

#### 1. 523(a)(4): Melanie

The testimony of Nickerson and Melanie regarding creation of the trust is largely consistent. Where there are inconsistencies, I credit Nickerson's but not Melanie's.

Melanie, as Nickerson's life-long friend, agreed with Nickerson to receive and hold the funds for Nickerson's benefit and return the funds to Nickerson on request. Although the parties did not use a writing or even oral language of trust in creating or describing the arrangement, their arrangement created an oral express trust, and the parties' consistent testimony constitutes clear and convincing evidence, as required under Oregon law to establish an oral trust.[2]

Melanie argued that a trust couldn't have been created because it would have had an unlawful purpose:[3] to protect the J.P. Morgan account proceeds

---

[2] Or. Rev. Stat. § 130.180.
[3] Or. Rev. Stat. § 130.165.

Page 7 – MEMORANDUM DECISION AFTER TRIAL

from Nickerson's creditors. A debtor's transfer of property with the intent to hinder, delay, or defraud creditors can sometimes be avoided and recovered by a creditor[4] or a bankruptcy trustee.[5] But Melanie refers to no law making those transfers unlawful in the sense of prohibiting or penalizing them, rather than just creating avoidance powers.

According to both Nickerson and Melanie, the beneficiary change occurred after the mother died, and Nickerson claimed to have used the power of attorney to make that change. But under Oregon law, the death of the principal under a power of attorney terminates the agent's authority.[6] Melanie knew that the mother had died before the beneficiary change and that Nickerson relied on the power of attorney to make the beneficiary change, so Melanie had at least constructive knowledge that the beneficiary change was ineffective. Either the change was ineffective, making Nickerson the account beneficiary, or if it was effective, Melanie understood and agreed that the change was made solely to facilitate the trust.

That Melanie held in her own name property that she had agreed to hold in trust for Nickerson is not inconsistent with the existence of a trust; property held in trust is owned by the trustee—subject to the trust. I heard no evidence that Nickerson intended to and did make an outright gift to Melanie of the J.P. Morgan account proceeds.

---

[4] Or. Rev. Stat. § 95.230(1)(a)
[5] 11 U.S.C. § 548(a)(1)(A).
[6] Or. Rev. Stat. § 127.015(1)(a).

Page 8 – MEMORANDUM DECISION AFTER TRIAL

Melanie breached her fiduciary duty to Nickerson by failing to keep the funds safe and return all the funds at Nickerson's request. By depositing the funds in their account, Melanie exposed the funds to judgment collection by the Birchfields' creditors, including the garnishment that resulted in the loss of $6,000. Had Melanie deposited the funds in a new, separate account in the name of "Melanie Birchfield, as trustee for Kelly Nickerson," no creditor of the Birchfields could have garnished the funds.

But to constitute defalcation under 523(a)(4), a fiduciary-duty breach must "involve bad faith, moral turpitude, or other immoral conduct" or else intentional wrongdoing or "reckless conduct of the kind that the criminal law often treats as the equivalent." That is the 2013 holding of the Supreme Court in *Bullock v. BankChampaign, N.A.*[7]

Here, there is no evidence that Melanie, in depositing the trust funds in the Birchfields' account, acted with any of the mental states listed in *Bullock*. The loss of the $6,000 cannot be attributed to defalcation. And Nickerson does not contend that any part of her claim is described by any of the other terms in 523(a)(4): fraud, embezzlement, or larceny.

On the other hand, I do find a culpable state of mind under *Bullock* for Melanie's failure to account for the remaining $3,929.62, as to which she gave no explanation, much less excuse or justification. The portion of the judgment

---

[7] 133 S.Ct. 1754, 1759 (2013).

attributable to that amount constitutes a debt for defalcation while acting in a fiduciary capacity.

Because the total amount that Melanie held in trust but failed to pay is $9,929.62, the portion of the judgment that is the product of the judgment balance and the fraction 392962/992962 (the ratio of $3,929.62 and $9,929.62) is nondischargeable. I previously calculated that the judgment balance on September 10, 2020, was $10,055.07. Thus $3,979.27 ($10,055.07 x 392962 / 992962), plus 9 percent interest, is a nondischargeable debt of Melanie. The balance of the judgment is not nondischargeable as to Melanie under 523(a)(4).

### 2. 523(a)(4): James

Unlike Melanie, James did not become a fiduciary for Nickerson. And in Nickerson's trial brief, she mentions only Melanie in requesting a determination of nondischargeability under 523(a)(4). James's debt is thus not nondischargeable under 523(a)(4).

### C. 523(a)(6)

A debt is nondischargeable under 523(a)(6) if it is for willful and malicious injury to a person or property. A debtor acts willfully either by subjectively desiring to cause harm or acting with the knowledge that harm would result.[8]

---

[8] Carillo v. Su (In re Su), 290 F.3d 1140, 1142 (9th Cir. 2002); In re Ormsby, 591 F.3d 1199, 1206 (9th Cir. 2010).

Page 10 – MEMORANDUM DECISION AFTER TRIAL

And an act is malicious if it is wrongful, done intentionally, necessarily causes injury, and is done without just cause or excuse.[9]

Nickerson contends that the Birchfields willfully and maliciously refused to return her trust funds despite their agreement to do so.

### 1. 523(a)(6): Melanie

Based on the similarity of the state-of-mind requirements for nondischargeability under 523(a)(4) for defalcation and under 523(a)(6), Melanie's debt is nondischargeable under 523(a)(6) in the same $3,929.26 amount I determined to be nondischargeable under 523(a)(4).

### 2. 523(a)(6): James

The only evidence of James's actions vis-à-vis the trust funds is that he thought the Birchfields should retain a portion to account for possible tax liability. But I have no evidence that he, rather than Melanie, wrote any checks on the Birchfields' account while it contained any of Nickerson's trust funds. I thus can't find that he caused Nickerson any injury, much less a willful and malicious one.

## IV. Conclusion

Of the amount due on the judgment, $3,979.27 plus 9 percent per year from September 10, 2020, is a nondischargeable debt of Melanie under 523(a)(4) for defalcation while acting in a fiduciary capacity and under 523(a)(6). It is not nondischargeable under 523(a)(2).

---

[9] Su, 290 F.3d at 1146-47.

The balance of Melanie's liability under the judgment, and all of James's liability, is dischargeable.

I will enter judgment.

### # # #